IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FELICIA LANN,                         )
                                      )   CIVIL ACTION NO.
                  Plaintiff,          )   _____
                                      )
v.                                    )
                                      )
INTERCONTINENTAL EXCHANGE,            )
INC. and METROPOLITAN LIFE            )
INSURANCE COMPANY,                    )
                                      )
                  Defendants.         )

### COMPLAINT (ERISA)

COMES NOW plaintiff, Felicia Lann ("Lann"), and files her complaint for damages pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1132(a)(1)(B) and (a)(3), and states as follows:

### Introduction

1.

This case arises out of defendants' refusal to pay life insurance benefits and accidental death insurance benefits to the surviving spouse of an employee of Intercontinental Exchange, Inc.  Plaintiff Lann was legally married to Dormekeal Lann, who died on April 13, 2016, at the time of Mr. Lann's death.  At the time of Mr. Lann's death, Mr. Lann was an employee of Intercontinental Exchange, Inc. and covered under its health and benefits plans, including policies of optional

1

life insurance and accidental death insurance issued by
Metropolitan Life Insurance Company ("MetLife").

2.

MetLife's optional life insurance policy and MetLife's
accidental death insurance policy are part of Intercontinental
Exchange's Employee Welfare Benefit Plan ("the Plan") regulated
by the Employee Retirement Income Security Act of 1974, as
amended, 29 U.S.C. § 1001-1461, and known as the
Intercontinental Exchange, Inc. Welfare Benefit Plan.  Under
Group Policy No. 158248-1-G, the Plan includes coverage for
Dormekeal Lann as follows: (A) MetLife Supplemental Optional
Life Insurance for $112,000.00 and (B) MetLife Accidental Death
and Dismemberment Insurance for $56,000.00.   Defendants
illegally and unlawfully denied payment of benefits under the
supplemental optional life and accidental death insurance
policies for the accidental death of Dormekeal Lann.  In denying
plaintiff Felicia Lann the optional life insurance and
accidental death insurance benefits to which she is entitled,
defendants have violated ERISA.

**Parties, Jurisdiction and Venue**

3.

Plaintiff repeats, realleges, and incorporates by reference
each and every allegation contained in paragraphs 1 through 2 of
the complaint, as if fully set forth herein.

2

4.

Plaintiff brings this action for declaratory, injunctive and monetary relief pursuant to § 502(a)(1)(B) and § 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3).  This Court has subject matter jurisdiction over plaintiff's claims pursuant to ERISA §§ 502(e) and (f), 29 U.S.C. §§ 1132(e) and (f), and 28 U.S.C. § 1331.

5.

Venue lies in the Northern District of Georgia pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the ERISA-governed plan at issue was administered in part in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391(b) because some of the events or omissions giving rise to plaintiff's claims occurred within this District, and plaintiff resides in this District.

6.

At all relevant times, plaintiff Felicia Lann has been a beneficiary, as defined by ERISA § 3(8), 29 U.S.C. § 1002(8), of the Plan, and specifically a beneficiary of the policies of optional life and accidental death insurance issued as part of the Plan.  At all relevant times, plaintiff Felicia Lann's late spouse, Dormekeal Lann, was a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan.

7.

At all relevant times, defendant Intercontinental Exchange, Inc.'s Plan, known as the Intercontinental Exchange, Inc. Welfare Benefit Plan, has been an employee welfare benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

8.

At all relevant times, the Plan offered, *inter alia*, optional life insurance and accidental death insurance to Intercontinental Exchange employees, including plaintiff's decedent Dormekeal Lann.

9.

At all relevant times, defendant Intercontinental Exchange, Inc. has been a fiduciary of the Plan.  Intercontinental Exchange, Inc. is a named administrator of the Plan within the meaning of ERISA 3(16)(A), 29 U.S.C. § 1002(16)(A), and is the Plan sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).  Intercontinental Exchange, Inc. is a Delaware corporation authorized to transact business in Georgia and may be served with legal process at United Agent Group, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30066.

10.

At all relevant times, defendant Metropolitan Life Insurance Company ("MetLife") has been a fiduciary of the Plan. Metropolitan Life Insurance Company is a named administrator of

the Plan within the meaning of ERISA 3(16)(A), 29 U.S.C. §
1002(16)(A).  Metropolitan Life Insurance Company is a New York
corporation authorized to transact business in Georgia and may
be served with legal process at CT Corporation System, 289 South
Culver Street, Lawrenceville, Georgia 30046-4805.

11.

The Plan provides that MetLife reviews claims for benefits
and makes the determination of whether to approve or deny
claims, including claims for optional life insurance benefits
and claims for accidental death benefits under and pursuant to
the MetLife optional life insurance and accidental death
insurance policies issued under the Plan.

**Facts Underlying Plaintiff's Claims for Violation of ERISA**

12.

Plaintiff repeats, realleges, and incorporates by reference
each and every allegation contained in paragraphs 1 through 11
of the complaint, as if fully set forth herein.

13.

As a result of the accidental death of her husband
Dormekeal Lann, an employee of Intercontinental Exchange, Inc.
and covered under the Plan, plaintiff Lann submitted claims for
optional life insurance benefits and accidental death insurance
benefits under and pursuant to the Plan.  MetLife denied
plaintiff Lann's claims for benefits under MetLife's optional

life and accidental death insurance policies because MetLife
erroneously concluded the cause of Dormekeal Lann's death was
the result of suicide.  *See* November 30, 2016 letter to MetLife
with supporting documentation, attached as Exhibit A; *see*
December 23, 2016 letter from Metlife, attached as Exhibit B.

14.

Plaintiff Lann formally appealed MetLife's denial of
benefits under MetLife's optional life and accidental death
insurance policies and provided conclusive evidence to MetLife
that Dormekeal Lann's death was accidental and was not a
suicide.  *See* February 17, 2017 letter to MetLife with
supporting documentation and legal authorities, attached as
Exhibit C; *see* May 17, 2017 letter to MetLife, attached as
Exhibit D.

15.

MetLife disregarded the overwhelming evidence of Dormekeal
Lann's accidental death and dispositive factual evidence and
legal authority in support thereof which was presented in
plaintiff Lann's appeal of her claims denial.  MetLife continues
to deny plaintiff Lann's claims for insurance benefits because
MetLife erroneously insists that Dormekeal Lann's death was a
suicide despite overwhelming evidence that his death was
accidental.  *See* March 16, 2017 letter from MetLife, attached as

6

Exhibit E; *see* June 22, 2017 letter from MetLife, attached as
Exhibit F.

16.

MetLife illegally and unlawfully denied payment of
insurance benefits to plaintiff Lann under the Plan which
includes coverage for Dormekeal Lann as follows: (A) MetLife
Supplemental Optional Life Insurance for $112,000.00 and (B)
MetLife Accidental Death and Dismemberment Insurance for
$56,000.00.  *See* Life Insurance Claim Form – Employer's
Statement, Exhibit E, p. 6.

17.

Plaintiff Lann has presented conclusive evidence to MetLife
that Dormekeal Lann's death was accidental and was not the
result of suicide.

18.

Because Dormekeal Lann's death was accidental, plaintiff
Lann is entitled to payment of benefits under MetLife's optional
life insurance and MetLife's accidental death insurance policies
under the Plan.

19.

The Department of Health and Human Services Center for
Disease Control and Prevention ("CDC") has codified the
scientific peer review standards for Medical Examiners' and
Coroners' determination of suicide.  These standards show that

the <u>intent of the decedent</u> is the primary area of investigation for medical examiners in determining the manner of death.

20.

*The Center for Disease Control (CDC) Medical Examiners' and Coroners' Handbook On Death Registration and Fetal Death Reporting, 2003* states:

One of the more difficult tasks of the medical examiner or coroner is to determine whether a death is an accident or the result of an intent to end life.  The medical examiner or coroner must use all information available to make a determination about the death.  This may include information from his or her own investigation, police reports, staff investigations, and discussions with the family and friends of the decedent.

**Determining a suicide**

*There is evidence that death was self-inflicted.  Pathological (autopsy), toxicological, investigatory, and psychological evidence, and statements of the decedent or witnesses, may be used for this determination.

*There is evidence (explicit and/or implicit) that at the time of injury the decedent intended to kill self or wished to die and that the decedent understood the probable consequences of his or her actions.

*Explicit verbal or nonverbal expression of intent to kill self.

*Implicit or indirect evidence of intent to die, such as the following:

-Expression of hopelessness;

-Effort to procure or learn about means of death or rehearse fatal behavior;

-Preparation for death, inappropriate to or unexpected in the context of the decedent's life;

-Expression of farewell or desire to die, or acknowledgement of impending death;

-Precautions to avoid rescue;

-Evidence that decedent recognized high potential lethality of means of death;

-Previous suicide attempt;

-Previous suicide threat;

-Stressful events or significant losses (actual or threatened);

-Serious depression or mental disorder.

21.

MetLife has denied and continues to deny payment of optional life and accidental death insurance benefits to plaintiff Lann solely because Mr. Lann's State of Georgia Death Certificate shows "suicide" as the "manner of death".

22.

Under Georgia law, the death certificate is not admissible
to establish the cause of death.  The Court of Appeals of
Georgia has stated: "[T]he rule [has] emerged that a death
certificate serves as prima facie evidence only of (1) the death
itself and (2) the immediate agency of the death.  Other
conclusions, such as those regarding the events leading up to
the death or whether the cause of death was intentional or
accidental, are not admissible." *King v. State*, 151 Ga. App.
762, 763, 261 S.E.2d 485, 486 (1979).  State law determines the
admissibility of death certificates (and information thereon) in
ERISA actions.  *See Redeaux v. Southern National Life Ins. Co.*,
No. 10-30670, p.4 (5th Cir. 2011).

23.

MetLife has acted and continues to act in bad faith in
relying solely on the manner of death shown on the death
certificate of "suicide" in denying payment of insurance
benefits to plaintiff Lann.

24.

The State of Georgia Death Certificate of Dormekeal Lann
was improperly and erroneously prepared by Gwinnett County
Medical Examiner Dr. Carol A. Terry, who failed to follow
established and scientifically accepted protocols in making a
determination of the manner of Dormekeal Lann's death.

25.

Plaintiff Lann requested that Dr. Terry review and reconsider her determination of the manner of Dormekeal Lann's death pursuant to established and scientifically accepted protocols, specifically including the review of fact witness and expert witness sworn statements and taking into consideration all of the evidence and expert affidavits that Dr. Terry did not have access to at the time of her initial finding of the cause of death of Dormekeal Lann.

26.

Dr. Terry indicated through her staff that Dr. Terry refused to read, listen to, or review any information in making a determination of manner of death other than whether in a case such as Dormekeal Lann's the gun was in contact with the deceased's person's head and that same person pulled the trigger. In other words, according to Dr. Terry, the physical findings alone dictate a finding of suicide in this case.

27.

This same erroneous and medically unsupported position was expressed formally in Dr. Terry's Autopsy Report, which stated "[s]ince the firearm was pressed against the subject's head at the time that it was discharged, this action is considered to be innately self-destructive; therefore, the manner of death is certified as 'suicide'".

28.

The medical examiner Dr. Terry's opinion that Mr. Lann's death was a suicide (as indicated in Box 37 of the Death Certificate) was made without any inquiry into facts, circumstances or events preceding Dormekeal Lann's death. Instead, Dr. Terry's opinion of suicide was premised solely on the fact that there was physical contact between the pistol and Dormekeal Lann's head.  Neither Dr. Terry nor any member of her staff interviewed any witnesses or persons having contact with Dormekeal Lann on the day of his death.  These witnesses, whose affidavits are attached to Ex. A, include two friends who shared a three-way telephone call with Dormekeal Lann just an hour or two before Mr. Lann's death.  The Gwinnett Medical Examiner's office did not request or conduct any interviews with family, work colleagues or friends and made no inquiry into Dormekeal Lann's financial, emotional, or family situation.

29.

According to Dr. Terry's staff, in contradiction to all legal and medical precedent, Dr. Terry will not consider any "non-scientific" information in her determination of suicide in Dormekeal Lann's case.  Further, Dr. Terry will not review the documentation or information provided by plaintiff Lann because Dr. Terry claims that her physical findings alone conclusively supports suicide as the manner of death.  According to Dr.

Terry, an inquiry into the state of mind or "intent" of the
deceased is unnecessary and is irrelevant to her determination
of "accident" or "suicide" by gun.  Dr. Terry through her staff
provided no scientific standard of review or peer reviewed
sources or law in support of Dr. Terry's methodology in
determining the manner of death.

                              30.

     Authoritative medical literature in the field and federal
and Georgia legal precedent show that the correct procedure to
determine whether the manner of death was "accident" or
"suicide" or "undetermined" is 100% contrary to Dr. Terry's
opinion.  By definition, suicide is the act of taking one's life
"intentionally".  There are countless self-inflicted deaths by
gun as a result of mistake, accident, trip and fall while
holding a gun, inebriation, duress where another demands an
individual shoot himself (murder under the law), as well as
simple mistake or stupidity.  Dr. Terry's standard of review is
absurd on its face, and is not in conformance with and
completely outside accepted scientific standards of practice for
Medical Examiners.

                              31.

     Dr. Terry's conclusory autopsy finding of suicide is not
admissible to establish Dormekeal Lann's suicide under Georgia
law.  *See* ¶ 22.  MetLife therefore cannot rely solely on Dr.

                              13

Terry's conclusion of suicide on the death certificate in denying the payment of insurance benefits to plaintiff Lann.

32.

Plaintiff Lann provided Metlife with sworn expert testimony from Dr. Kris Sperry, the Chief Medical Examiner for the State of Georgia from 1997 until his retirement in 2015. Dr. Sperry has personally performed over 6,600 autopsies and seen, witnessed, participated in, or reviewed between 90,000 and 92,000 autopsies. Dr. Sperry has trained and/or supervised many of the forensic pathologists now employed as county local Medical Examiners throughout Georgia, including Dr. Carol Terry.

33.

Following his review of all available information concerning Dormekeal Lann, including the autopsy report, pictures, police report, witness statements, immediate and historical contextual information such as finances, medical history, emotional state, family life, last days and minutes of life, etc., and applying accepted national standards for Medical Examiners in determining cause of death, Dr. Sperry concluded that the manner of death for Dormekeal Lann was "accident".

34.

Among the documentation and information considered by Dr. Sperry were the autopsy report, the death certificate, the police report and photographs, and lay witness affidavits of

plaintiff Lann, Dormekeal Lann's mother, and two of Dormekeal
Lann's friends.

35.

Dr. Sperry states that Dr. Terry's conclusion of suicide
reflects cognitive bias and that Dr. Terry's examination and
investigation should have included a review of the decedent's
recent and long term life history, his familiarity/non-
familiarity with guns and gun safety, and other information from
the decedent's wife, family and friends.

36.

Dr. Sperry states in his affidavit that review of these
materials in connection with this case reveal the following: "On
April 13, 2016, the day of Dormekeal Lann's death, he spoke to
his wife, Felicia . . . about the fact that she had just bought
him a Peach Pass which would give him paid access to the Express
Lanes on I-85 during rush hour.  He was thrilled.  On that same
day, two of his best friends from boot camp, Tony Robinson and
Tyrone Boone, called Dormekeal Lann's cell phone on a three way
conference call to ask advice on a problem Tyrone was having
with a computer or electronic equipment.  They were laughing and
made plans to meet two days later at a restaurant.  They
describe Dormekeal in that phone call as excited and happy
especially about his new job."  Sperry Affidavit, attached to
Ex. A, ¶ 6.

37.

Dr. Sperry goes on to state in his affidavit that "[a]s he finished the phone call with his two friends Dormekeal Lann came home from his work in Information Technology at Intercontinental Exchange . . . owners of the New York Stock Exchange.  He greeted his 7 year old daughter on her way to bed and wished her a good night.  He exchanged pleasantries with his wife, and then made himself a drink and went downstairs to the basement to work on a new song he had been writing.  After a few minutes he came upstairs to the main floor and said to his wife, 'I just finished the new track.'  He was 'very happy'."  Sperry Affidavit, attached to Ex. A, ¶ 6.

38.

Dr. Sperry states in his affidavit that based on the evidence "[Dormekeal Lann] went to the kitchen table and started taking apart his new gun, while talking with his wife about his new job which brought with it a pay increase which would allow them to finish some planned home construction.  They also discussed and Dormekeal was encouraging his wife to get a new family car as their two cars were not new.  Mr. Lann asked his wife to make some calls the next day to get quotations for construction work, and then went to put the gun away to eat dinner.  He asked his wife to keep his dinner warm.  His wife heard him get up and walk down the hall, heard 'the gun making a

distinct metal gun noise a few times', and then she heard a
shot.  She found her husband lying halfway in the bathroom and
halfway in the hall, bleeding from the head.  He had been shot
in the head on his way to put the gun away." Sperry Affidavit,
attached to Ex. A, ¶ 6.

39.

Dr. Sperry testifies that "[i]n determining that Mr. Lann's
manner of death was suicide, Dr. Terry, the medical examiner of
Gwinnett County, Georgia, operated on the assumption that Mr.
Lann's act of putting a loaded gun to his head was prima facie
'innately a self-destructive act', and therefore the manner of
death had to be a 'suicide'."  Dr. Sperry testifies that it is
his opinion "that [Dr. Terry's] assumption is flawed, and the
Mr. Lann's death was accidental."  Sperry Affidavit, attached to
Ex. A, ¶ 7.

40.

Dr. Sperry states that "Dr. Terry did not interview anyone,
including Felicia Lann who was with her husband at the time of
his death, nor was Dr. Terry in possession of any of the
information contained in the affidavits of Felicia Lann,
relatives and friends.  At the time of Dr. Terry's finding of
'suicide' she possessed no background or contextual information.
There is a plethora of evidence contained in the affidavits of
Mr. Lann's wife, relatives and friends, which supports the

conclusion that Mr. Lann did not intend to kill himself.  None
of this information supports a conclusion of intent to die.  The
act of putting a gun to one's head does not necessitate the
intent to commit suicide.  Obvious other conclusions include
forgetfulness or mistake that a bullet is actually in the
chamber resulting in accidental death.  In my professional
career I have dealt with numerous determinations of self-
inflicted accidental death wherein the underlying causes of
death were stupid decisions or mistaken beliefs and not intent
to die."  Sperry Affidavit, attached to Ex. A, ¶ 8

41.

Dr. Sperry testified further that "[f]or the purpose of
determining for insurance reasons whether the death was
intentional or accidental, it is necessary to look at the
entirety of Mr. Lann's life on the day of his death, how he was
feeling, what he had planned for the future, and whether he had
any history of suicidal ideation."  In Dr. Sperry's opinion,
"[Dormekeal Lann's] plans involving meeting with friends in two
days, making plans to remodel a portion of the house and
purchasing a new car, asking his wife to warm his dinner in the
oven, and numerous other details including a new job which he
loved, a raise in income, and wife and daughter who were the
loves of his life - collectively, leads to the conclusion that
the act of putting a gun to his head and pulling the trigger was

18

stupid, a mistake, or a combination of both but was not an
intentional act to end his life."  Sperry Affidavit, attached to
Ex. A, ¶ 13.

42.

Dr. Sperry further testifies that "Dormekeal Lann was a
novice [gun owner].  His military training did not include
handgun training.  Novices such as Dormekeal Lann often think
they know how to safely handle a gun, while they do not.
Dormekeal Lann did not know his weapon, had not been trained,
and had only owned it for one week.  In my experience, when they
get a new gun, men try to familiarize themselves with it, trying
to learn how to go about it and take care of it properly,
loading and unloading ammunition, field stripping the gun,
taking the clip in and out of the gun, as Mr. Lann did before he
picked it up to put it away in the closet.  In my experience,
men who are inexperienced with guns often do dangerous things
because they don't realize and understand what actions which
appear seemingly innocuous are, in actuality, dangerous."
Sperry Affidavit, attached to Ex. A, ¶ 9.

43.

Dr. Sperry also testified that "Dormekeal Lann had some
portion of one drink prior to his death.  His blood alcohol
level was well below the Georgia legal presumption of .08 for
legal intoxication.  Though not intoxicated, alcohol affect[s] a

person's inhibitions and could lead to forgetfulness, making it more likely that he would do something like put a gun to his head to 'act macho' or forget or become confused as to the gun having a round in the chamber." Sperry Affidavit, attached to Ex. A, ¶ 11.

44.

In Dr. Sperry's opinion, Dr. Terry's opinion of suicide was based on inadequate evidence because Dr. Terry did not consider any evidence beyond the fact there was physical contact between the decedent's head and the gun. Dr. Sperry testifies that "Dr. Terry's conclusion also reflects a form of cognitive bias, wherein the conclusion was reached solely by opinion of the examiner, without any review of the decedent's recent and long-term life history, his familiarity (or lack of familiarity) with handguns, or information from his wife and friends." Sperry Affidavit, attached to Ex. A, ¶ 12.

45.

Dr. Sperry states that "[i]n a case such as this, where there is a complete absence of evidence suggesting suicidal ideation, the possibility must be considered that it was Mr. Lann's lack of knowledge of guns, combined with lowered inhibitions resulting from alcohol consumption, and his habit of forgetfulness and absent-mindedness that was the cause of this death." Sperry Affidavit, attached to Ex. A, ¶ 17.

20

46.

Dr. Sperry goes on to say the "[a] conclusion that Mr.
Lann's death was the result of a suicide does not take into
account the many other possibilities described above, and is
unnecessarily result driven.  The immediate and long term
social, emotional, financial and professional history of
Dormekeal Lann describes a character and personality of someone
who was stable and happy."  Sperry Affidavit, attached to Ex. A,
¶ 16.

47.

Dr. Sperry concludes that "[i]t is my professional opinion,
considering all the information we have available to us about
the circumstances of his life and death, that the death of
Dormekeal Lann was an accident."  Sperry Affidavit, attached to
Ex. A, ¶ 18.

48.

In his second affidavit, Dr. Sperry states that "[i]n
determining that manner of death is 'suicide', a medical
examiner must look to peer reviewed and authoritative sources
regarding how 'suicide' is to be determined.  The Center for
Disease Control, in its CDC Manual for Coroners and in a 1998
article 'Operational Criteria for Determining Suicide' in its
peer reviewed journal, 'Morbity and Mortality Weekly Report',
states that the determination of suicide must be a two step

process: There must be evidence that the death was self-
inflicted, and there must be evidence (explicit and/or implicit)
that, at the time of the injury, the decedent intended to kill
himself/herself or wished to die and that the decedent
understood the probably [sic] consequences of his/her actions."
Second Affidavit of Kris Sperry, attached to Ex. C, ¶ 6.

49.

Dr. Sperry testifies that "[e]vidence of intent may include
explicit verbal or nonverbal expression of intent to kill self;
or implicit or indirect evidence of intent to die, such as
preparations for death inappropriate to or unexpected in the
context of the decedent's life, expression of farewell or the
desire to die or an acknowledgment of impending death,
expression of hopelessness, expression of great emotional or
physical pain or distress, effort to procure or learn about
means of death or to rehearse fatal behavior, precautions to
avoid rescue, evidence that decedent recognized high potential
lethality of means of death, previous suicide attempt, previous
suicide threat, stressful events or significant losses, or
serious depression or mental disorder."  Second Affidavit of
Kris Sperry, attached to Ex. C, ¶ 7.

50.

Dr. Sperry goes on to say "[a]s stated in the 'Opinion'
section of the autopsy report, the medical examiner in Mr.

Lann's case determined that the manner of death was 'suicide' by using just one of the factors outlined in the CDC operational criteria for defining suicide-- that it was 'self-inflicted'. The medical examiner did not consider the second prong of 'intent'."  Second Affidavit of Kris Sperry, attached to Ex. C, ¶ 8.

51.

Dr. Sperry testifies that "[w]hen examining the questions of whether a death was a suicide or accident, a medical examiner must evaluate both whether the injury was 'Self-Inflicted' and whether there was 'Intent' on the part of the decedent to commit suicide.  In the case of Mr. Lann, it is clear from the affidavits of family and close friends and the detailed facts contained therein that there was no intent on the part of Mr. Lann to commit suicide."  Second Affidavit of Kris Sperry, attached to Ex. C, ¶ 9.

52.

Dr. Sperry concludes in his second affidavit that "[i]t is my opinion, using both the factual evidence and the operational criteria for determining suicide as set forth by the CDC Manual and other authoritative sources, that Mr. Lann's manner of death was accident.  In the absence of intent, it cannot be determined as suicide."  Second Affidavit of Kris Sperry, attached to Ex. C, ¶ 10.

53.

MetLife also cannot rely solely on Dr. Terry's finding of
suicide in refusing to pay plaintiff Lann insurance benefits
because there is a firmly established common law presumption
against suicide in the 11th Circuit.  *Acree v. Hartford Life &*
*Accident Co.*, 917 F. Supp. 2d 1296 (M.D. Ga. 2013).  The *Acree*
court stated that under this rule "the presumption never drop[s]
out of the case until the factfinder [i.e., the Court] becomes
convinced, given all the evidence, that it is more likely than
not that [the insured] committed suicide."  *Id.* at 1307, *quoting*
*Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1042
(11th Cir. 1998).

**MetLife's Bad Faith Reliance and Breach of Fiduciary Duties**

54.

Plaintiff repeats, realleges, and incorporates by reference
each and every allegation contained in paragraphs 1 through 53
of the complaint, as if fully set forth herein.

55.

Metlife continues to wrongfully deny plaintiff Lann's claim
for benefits under the decedent's optional life and accidental
death policies, and MetLife is acting in bad faith in denying
benefits in violation of its fiduciary duties under the plan.

56.

MetLife cannot in good faith continue to wrongfully deny plaintiff Lann's claim for insurance benefits based solely upon flawed, conclusory, inadmissible documents, specifically the death certificate and autopsy report by Dr. Carol Terry.

57.

Dr. Terry refused to review any of the supporting documentation and evidence presented to her and recited herein. Dr. Terry refused to perform any investigation whatsoever into the death of Dormekeal Lann. Dr. Terry's methodology in completing the death certificate is completely outside the national Medical Examiner/Coroner standards of practice recited herein at paragraph 20. Dr. Terry's conclusion of "suicide" is demonstrably incorrect.

58.

MetLife cannot deny plaintiff Lann's claims for insurance benefits based on the abundant clear evidence of Dormekeal Lann's accidental death and absolutely no evidence of Dormekeal Lann's intent to die.

59.

In wrongfully denying plaintiff Lann's claim for insurance benefits and failing to consider the overwhelming evidence of the accidental death of Dormekeal Lann, MetLife has acted in bad faith in violation of its fiduciary duties under the plan.

60.

MetLife further has acted in bad faith by failing to conduct its own investigation into the cause of death of Dormekeal Lann in violation of its fiduciary duties under the plan.

61.

MetLife further has acted in bad faith by imposing evidentiary burdens upon plaintiff Lann not required under the Plan or required or authorized by law.  Specifically, MetLife insists that Dr. Carol Terry change the cause of death on the death certificate to "accident".  This requirement is not contemplated by the Plan or under applicable law.

62.

MetLife's decision to rely on the death certificate and the medical examiner's findings as the basis for its denial of insurance benefits was, and continues to be, made in bad faith and in violation of MetLife's fiduciary duties under the Plan.

### FIRST CLAIM FOR RELIEF

**[Claim for Benefits Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Against All Defendants]**

63.

Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 62 of the complaint, as if fully set forth herein.

64.

Plaintiff has exhausted her administrative remedies.

65.

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant or beneficiary to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

66.

ERISA requires the Plan to pay benefits under optional life insurance and accidental death insurance policies to the beneficiary of such policies in the event of the accidental death of the named insured on the policies.

67.

As the decedent's beneficiary under the optional life and accidental death policies, plaintiff Lann is entitled to benefits under those policies because the death of her late spouse Dormekeal Lann was an accident.

68.

By denying plaintiff Lann benefits under the optional life and accidental death policies, all defendants have violated, and continue to violate, the terms of the Plan, plaintiff Lann's rights under ERISA and the Plan, and governing and controlling law.

## SECOND CLAIM FOR RELIEF

**[Claim for Breach of Fiduciary Duty Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Against All Defendants For Failure to Administer Plan in Accordance with Applicable Law]**

69.

Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 68 of the complaint, as if fully set forth herein.

70.

ERISA 404(a), 29 U.S.C. § 1104(a) requires that a fiduciary discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in accordance with the documents and instruments insofar as such documents and instruments are consistent with other provisions of ERISA.

71.

ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a beneficiary of a plan to file suit to "enjoin any act or

practice" that violates Title I of ERISA or the terms of a plan, and/or to obtain "other appropriate relief" to redress such violations, including failure to pay insurance benefits under Title 1 of ERISA.

72.

By engaging in the acts and/or omissions described herein, including but not limited to refusing to provide plaintiff Lann a benefit mandated by the Plan, refusing to investigate the death of the decedent, interpreting the Plan and optional life and accidental death insurance policies in a manner contrary to applicable law, and refusing to apply the law in effect at the time of Dormekeal's death, all defendants have breached their fiduciary duty to plaintiff Lann.

73.

As a result of all defendants' breaches of fiduciary duty and violations of Title 1 of ERISA, plaintiff Lann has been harmed.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Lann prays that the Court grant the following relief:

As to the First Claim for Relief:

A. Declare that defendants have violated the terms of the Plan;

B. Declare that plaintiff Lann has a right to benefits under

the optional life insurance and accidental death

insurance policies issued by MetLife under the Plan;

C. Order the defendants to pay benefits of $112,000.00 under

the optional life insurance policy and $56,000.00 under

the accidental death insurance policy issued by MetLife

under the Plan, with prejudgment interest;

D. Award plaintiff Lann reasonable attorney's fees and costs

of suit pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

and

E. Provide such other relief as the Court deems equitable

and just.

As to the Second Claim for Relief:

A. Declare that defendants breached their fiduciary duty to

plaintiff Lann;

B. Declare that by refusing to pay mandated insurance

benefits to plaintiff Lann, defendants have violated

ERISA;

C. Declare that plaintiff Lann has a right to benefits under

the optional life insurance and accidental death

insurance policies issued by MetLife under the Plan;

D. Order that defendants pay to plaintiff Lann amounts to

make plaintiff Lann whole for the harm she has suffered

due to defendants' breaches by providing other

appropriate equitable relief, including but not limited

to surcharge, restitution, prejudgment interest, and
imposing a constructive trust and/or equitable lien on
any funds wrongfully held or administered by defendants;

E. Award plaintiff Lann reasonable attorney's fees and costs
of suit pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);
and

F. Provide such other relief as the Court deems equitable
and just.

Respectfully submitted this 7th day of December, 2017.


MICHAEL A MILLS, P.C.

By: _____
       Michael A. Mills

Michael A. Mills
Georgia Bar No. 509720
1349 W. Peachtree St. NW
Suite 1995
Atlanta, Georgia 30309
Telephone: (404) 815-9220
Facsimile: (678) 317-0956
mike@millslegal.net

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing pleading complies with the font and point selections approved by the Court in Local Rule 5.1B. This document has been prepared in Courier New font, 12 point.

MICHAEL A MILLS, P.C.

/s/ Michael A. Mills
Michael A. Mills
GA Bar No. 509720
1349 W. Peachtree St. NW
Suite 1995
Atlanta, Georgia 30309
Telephone: (404) 815-9220
Facsimile: (678) 317-0956
mike@millslegal.net